UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| KIMBERLY A. POIRIER, | ) | Civil Action No.: 4:11-1731-JMC-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |
| THE CITY OF MYRTLE BEACH, and | ) | |
| CITY OF MYRTLE BEACH POLICE | ) | |
| DEPARTMENT, | ) | |
| | ) | |
| Defendant. | ) | |

## I.    INTRODUCTION

This action arises out of Plaintiff's employment with Defendant City of Myrtle Beach in the

Police Department.  Plaintiff alleges she suffered gender discrimination, age discrimination, a hostile

work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII),

42 U.S.C. § 2000(e) et seq. and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §

621 et seq.  Presently before the Court is Defendant's Motion for Summary Judgment (Document

# 25).  All pretrial proceedings in this case were referred to the undersigned pursuant to the

provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this

is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

## II.    FACTS

### A.    Plaintiff's Employment

Police Chief Warren Gall hired Plaintiff as a Police Officer in February of 2001 and

promoted her to Senior Patrolman in January of 2003.  Gall Aff. ¶ 3.  Plaintiff received several

certifications during her employment with the Defendant, including Myrtle Beach Rotary Club

Officer of the Year, and Appreciation for Outstanding performance on several occasions in 2008. Ex. 2, Parts 4 & 5 to Pl. Response.  On April 21, 2008 Plaintiff was highly complimented by a resident for her actions in assisting the resident.  <u>Id.</u> On April 10, 2008, Sgt. Prock provided a letter regarding Plaintiff's actions and several other officers' assistance in the Police Unity Fundraiser.  <u>Id.</u> Lt. McCorkle also added a letter to Plaintiff's employee file due to Plaintiff's exceptional performance in organizing the Humane Fair.  <u>Id.</u>  The Chief also sent Plaintiff and other officers a Letter of Outstanding performance regarding the same Fair.  <u>Id.</u>  In October of 2007 a letter of appreciation was added to Plaintiff's file regarding her presentations to Coastal Carolina College and the Help us Help you program.  <u>Id.</u>  Sgt. Prock again added an accommodation for actions during a search warrant execution.  <u>Id.</u>

While employed with the Defendant Plaintiff was featured in several newspaper articles regarding her performance as a police officer and her involvement in several community projects. Ex. 2, Parts 5 & 6 to Pl. Response.

Plaintiff's evaluations were consistently exceeds expectation or substantially exceeds expectations.  Ex. 3, Parts 1-4 to Pl. Response.  Even on the last year of Plaintiff's employment in March of 2009, Plaintiff received a substantially exceeds expectations from Sgt Prock and a meets expectations from Shannon Toole. Included in the evaluations were several comments regarding her abilities and opportunities to improve.  Ex. 3 to Pl. Response.

Plaintiff asserts that she applied for and was denied a promotion to Corporal in July 2009, July 2008, July 2007, and July 2006.  Pl. Dep. p. 15.  She further testifies that younger, less qualified males, Brian Truex and Jather Stevens, were promoted over Plaintiff "thereabouts" July of 2009 and over the course of 2008 and 2009.  Pl. Dep. p. 16-17.  However, Stevens was promoted to Corporal

effective September 26, 2008, and Truex was promoted to Corporal effective February 27, 2009. Gall Aff. ¶ 6. Gall avers that no other officers were promoted to Corporal after Truex prior to Plaintiff's resignation. Id.

Plaintiff served as a Field Training Officer for several years. Pl. Dep. p. 17. In July of 2008, Plaintiff was informed that she was being transferred to Traffic on the night shift with no notice and that she would no longer serve as a Field Training Officer. Pl. Dep. Ex 2 p. 525.

Also in July of 2008, Plaintiff requested to go to day shift as she had been on night shift for nearly a year. Id. Plaintiff was informed that it would be awhile; however, Plaintiff witnessed two male officers transferred to day shift over Plaintiff. Id. In August of 2008, Plaintiff confronted Corporal Toole about treating her differently than other officers. Id.[1]

In January of 2009, Plaintiff expressed interest in a new specialized unit called Traffic Enforcement Unit. Plaintiff requested and was denied a transfer to the unit. Instead, Defendant transferred three younger males to the Specialized Unit. Pl. Dep. p.525. The two male officers did not have experience in radar, data master, and SFST Certification. Id. Corporal Allen was the supervisor over the unit. Pl. Dep. p. 21.

Plaintiff felt she was being drug screened more than other officers and expressed her concern to Captain Vella that she was being targeted. Vella informed Plaintiff that he had never been subjected to a drug test. Pl. Dep. pp. 23-24. At the end of 2008, Plaintiff complained to Human Resources regarding the number of drug tests that she was subjected to and the random drug tests stopped. Id. Plaintiff was also aware that it was very easy for a supervisor to go to Human

---

[1]Plaintiff asserts that an unidentified officer indicated to her in 2008 that Officers Dunn and Bertang did not like women in law enforcement. Pl. Dep. Ex. 3 p. 526. However, Plaintiff does not present any proper evidence to support this assertion.

Resources and ask a name to be pulled and the person be subjected to a drug test.  Id.

During Plaintiff's employment Plaintiff witnessed other officers whom she felt were treated more favorably. An officer drove a motorcycle into Costco to assist an officer with a shoplifter (Brian Truex) and received an oral reprimand.  Pl. Dep. pp. 26-27.  Another officer used a city computer for inappropriate personal reasons and was not disciplined as Plaintiff (James Kerns).  Pl. Dep. pp. 27-28.  Officer Kearns was transferred and received a written reprimand. She further states that Officers Truex and Dunn were not disciplined for misrepresenting facts in a staff meeting. However, Plaintiff provides no further description or detail of this alleged occurrence.

**B.    Events Leading to Plaintiff's Resignation in Lieu of Termination**

On August 12, 2009, the City learned of two what it felt were significant issues involving Plaintiff.  An investigation of those matters led to Plaintiff's decision to resign her employment on September 10, 2009.  Plaintiff's supervisor, Cpl. Truex, reported the following to his chain of command, Sgt. Bertang and Lt. Dunn, by email on August 12, 2009:

> I have two major issues that have come up with Kim [Poirier] today.
>
> First of all in reference to the traffic stop that we talked about earlier[,] Lt. Dunn.  I had given out a directive over the air to all units when the radios went out and all of the power was out to restrict all radio traffic including enforcement to essential traffic only. I know you and I spoke about this issue and that I would discuss it with her, but after reviewing her video of the stop (which she called in as Careless Operation once I called her to ch5 and she knew I was going to question her) was actually a stop for an expired tag. She called in the stop as careless operation to make it appear that she had an important reason to conduct a stop during the time when there was no or limited dispatch communication and she was directed not to do so.
>
> Second, when Kim turned in her car, Chad Rose obtained the vehicle from her.  When he did a vehicle inspection, he noted a 6 inch crack in the center rear bumper which had a matching one on the right side where the force of an impact [had] split the bumper. (After reviewing the pictures while typing this email, I noted that the metal support bracket that holds the bumper is snapped also.) Chad notified me of it and noted it on the sheet. I noted that there was a lot of mud under the right rear bumper

where the crack was. As Kim was leaving I asked her if she had taken any medians during the day and hit her rear bumper possibly causing the crack. She said no and that she had noticed it a few days ago and noted it on the log sheet and left for the day. I took the log sheet from the car and observed that Kim had noted on 8-3 that she had used the car and in the comments section it says "needs new rt front..." all of the writing is in a light ball point pen, and then after that notation in a dark ink pen there is a notation "rear bumper cracked", which is in the same pen as the one she used to log in the car on today's date. If she had noted the damage at the beginning of her shift on 8-3 I would think she would have written it in the same pen. Additionally, upon review of her videos where Officer Morrell expressed some concern to me about Kim's driving conduct in responding to a collision I observed Kim start to run code to a wreck on 501 and go off of the right side of 501 striking a large pot hole and her entire car dips hard to the right and rocks back and forth. The video shows her going off road and hitting the pothole at 27 mph and you can hear the thud of the car hitting. I believe that this is where the damage occurred from. Morrell advised that when he talked to Kim at the wreck he saw the crack and all of the mud and asked Kim what happened and she told him that she saw it a few weeks ago and that she had noted it on the sheet. Additionally on the log sheet Joe West had driven the car 4 times since the notation on the 3rd and upon asking Joe if he had seen the notation on the sheet about the cracked bumper he stated that it was not on the sheet before, and that if that damage was on the car not only would he have noted it on the sheet but he would have come and told me or Shannon. Joe stated that he did check the car very well, prior to a funeral escort because it was not his assigned car and was not familiar with it. Additionally, Jody Sutton came in and asked me what happened to car 80 (as he saw the rear bumper when he walked in at the end of the shift) and made the comment that car 80 wasn't damaged at the beginning of the day.

I attached the pictures of the car and of the log sheet. Please advise what direction you want to take in this matter.

Gall Aff. Ex. 58.[2]   Captain Vella (in the chain of command) asked for corrective action to be taken on the traffic stop, and that the issue of the vehicle damage be investigated due to concerns of a cover up. Id.

Plaintiff and Officer West were questioned again on August 13, 2009, after signing Garrity[3]

---

[2]The vehicle log referenced in the email is part of Gall Aff. Ex. 62.

[3]See Garrity v. New Jersey, 385 U.S. 493, 500 (1967) (holding that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic").

statements acknowledging the requirement that they answer questions truthfully. Gall Aff. Ex. 59 and 60. At Cpl. Truex's instruction after questioning, Plaintiff prepared a Loss Report and Special Report about the vehicle damage. Gall Aff. Ex. 61 and 62. Cpl. Truex prepared reports of the incidents and submitted them to Sgt. Bertang. Gall Aff. Ex. 64, 65, 66, 67. In a memo to Lt. Dunn on August 16, 2009, Sgt. Bertang summarized his concerns surrounding the issue as follows:

> This investigation had been remanded to Cpl. Truex from Capt. Fronz, the acting chief, to review and summarize. The issues that are raised are bifurcated: One concerns a traffic stop during a massive power-outage and the other concerns damage to traffic car #1080.
>
> The first issue that was reviewed was after Cpl. Truex had given out a directive over the radio during a major storm that swept through the city, leaving many intersections without power. Additionally, communications with dispatch were down and radio traffic was to be used for essential and emergency traffic.
>
> > 1. PFC Plaintiff disobeyed an immediate directive from Cpl. Truex by conducting a traffic stop for a very minor infraction during the outage and at a time that dispatch was in turmoil.
> >
> > 2. She falsely called out a careless operation traffic stop when it was for an expired tag.
> >
> > 3. She did not review the driver's license and only had minimal contact with the driver (18 seconds).
> >
> > 4. She did not advise the violator that the stop was being recorded.
> >
> > 5. The disposition of the stop appeared to be a guess.
>
> Cpl. Truex outlines the specific issues and regulation violations in his memo.
>
> The second issue concerns the damage to the bumper of car #1080. Upon reviewing the information presented, and talking with Cpl. Truex and Lt. Dunn, it appears that there is an overwhelming amount of evidence showing that car #1080 was damaged due to PFC Poirier hitting a large hole when she went off the road at 14:51:13 hours on 8-12-09 while responding to a collision. I have several issues with her responding to the collision – she did not notify dispatch of her code response, she drove on the shoulder of the road at 27 mph and hit a large pothole, and there are several safety concerns with her driving. I do not think that PFC Poirier intentionally damaged the car. I believe that it was an accident and occurred while she was responding to the collision, but it seems that Capt. Vella may be correct in that she may be trying to cover up the damage to avoid taking responsibility for it.
>
> > 1. If the damage was, in fact, discovered on 8-3-09, she failed to notify her supervisor.

-6-

2. Other officers drove the vehicle after that and did not observe the damage. Officer West drove that car, which is not his normally assigned car. He stated that he would have known if there were damage like that on the car.

3. On the video on 8-12-09, at 14:51:13 it clearly shows PFC Poirier going off the road and hitting a large hole. A 'thud' is heard and the car is rocked back and forth. A reflection of PFC Poirier in the safety glass from the rear camera shows her being jolted forward from the hole. It is highly likely that the damage to the bumper occurred at this time.

4. The writing in the comment section of the vehicle inspection sheet clearly shows 2 different types of pens used to annotate damage on 8-3-09. It is likely that she went back after the damage to the bumper occurred on 8-12-09 and wrote the bumper damage in the 8-3-09 comment section.

5. There are safety and driving issues that arise before and during the time that she responds to the collision.

6. The photos of the damage that were taken when PFC Rose addressed his concerns to Cpl. Truex show grass, dirt, and mud under the bumper consistent with when PFC Poirier hit the hole on the side of the road. It does not take much for the lip of the bumper to catch on something and then rip the support bracket off.

7. The damage is very fresh, and does not appear to be almost 10 days old.

8. Cpl. Truex's questioning of PFC Poirier shows that there is a high amount of her deflecting the questions and there are many indications that she is not being truthful about when the damage occurred. She keeps denying being in an accident, and I concur [with Cpl. Truex]. It seems that the car was damaged from her hitting a hole and there were lapses in judgment thereafter that incident.

Should the findings be sustained, as with others in similar situations in the past, I would recommend termination, not for the damage, but for trying to cover it up and not reporting the damage as it occurred. There are many issues that are to be addressed with PFC Poirier. I know that Cpl. Truex and I, both together and separately, have tried to work with her and provide her with the avenues to success and opportunities to advance, but these issues are serious and must be addressed and corrected.

Gall Aff. Ex. 70.

In a memo to Capt. Vella on August 18, 2009, Lt. Dunn summarized his concerns about the

car damage issue as follows:

On 8/12/09, damage to the rear bumper of car 80 was noticed by several officers that brought it to the attention of a supervisor. The car is assigned to Kim Poirier and she

had driven car 80 that day. When she was asked about the damage, she stated that she had noticed it back on 8/3/09 and annotated it on her vehicle inspection sheet. She did not however notify a supervisor of the damage.

A check of the Vehicle Inspection Sheet indeed revealed an annotation of the damage on 8/3/09, showing two separate entries in two different types of pens.  The vehicle information was listed in one type of ink and the note about the damage listed in another darker color ink similar to what was used on the sheet on 8/12/09.

The inspection sheet also listed two other officers that had driven the vehicle within the same time period (Officers Cozene and West). Both officers stated that the damage was not on the car when they drove it. In response to this, all three officers were called in and interviewed after being issued Administrative Advisement Forms. In addition to this, a video recording of Poirier responding to a traffic accident was reviewed which showed her going off of the roadway and over a large pot hole.

The interviews resulted in no clear cut answer as to how the damage occurred. Poirier openly admitted that she sometimes does not do a full inspection of her vehicle and again did not notify a supervisor upon finding the damage. These issues themselves require corrective action. I recommend a Written Reprimand for the following reasons. Had Poirier done a proper inspection daily, and notified a supervisor that there was damage on the car not noticed before, there would have been no investigation and this matter would have ended.

With there being discrepancies in Poirier's actions of not notifying a supervisor and the two types of ink on the Inspection Sheet, I recommend that Poirier be administered a Polygraph examination about the matter. Further disciplinary action in regards to the occurrence of the damage will depend on the results of the polygraph examination, up to and including termination of employment.

Gall Aff. Ex. 74.

The chain of command met on August 18, 2009, after which Capt. Vella conveyed to Chief Gall the chain of command's recommendation that Poirier be required to submit to a polygraph examination on the issue of damage to the vehicle.[4] Chief Gall approved that recommendation.  Gall Aff. Ex. 75.

Thereafter, with regard to the traffic stop incident, Sgt. Bertang recommended to his chain of command as follows, in a memo dated August 19, 2009:

---

[4]Plaintiff also asked to take a polygraph examination. Plaintiff Dep. p. 13.

I have reviewed the inquiry into the issues surrounding the traffic stop on 8-12-09. I have also been involved in a meeting on 8-18-09 with the chain of command where some of the issues were discussed and addressed. There are several issues that are of concern when it comes to this incident:

> 1. Failing to adhere to a directive that was given out in a time of emergency in the city.
>
> 2. Improperly calling out the reason for the traffic violation.
>
> 3. Failing to advise the violator about being audio and video recording.
>
> 4. A very brief and seemingly ineffective traffic stop – 18 seconds.
>
> 5. Not receiving or reviewing a drivers license, paperwork to clarify the expired registration, etc.
>
> 6. Estimating the age of the driver during the disposition portion of the traffic stop.

When there are major incidents in the city such as the one that occurred on this day, time should be spent addressing weather related issues such as flooded streets, stop lights that are out, disabled motorists, and other assistance or urgent calls. I believe that PFC Poirier exercised poor judgment in deciding to pull a car over for an expired registration. This stop also inconvenienced and frustrated dispatch which was having communication problems as well. Further, the traffic stop had compounding poor judgment issues as noted by the items listed above. Based on the above issue, as well as a similar violation that occurred involving PFC Poirier and Cpl. Toole (similar in nature), I recommend a temporary suspension from the Field Training Officer program because of the many other violations that have occurred. I recommend that a review of her status with the program be re-evaluated by the supervisors of the program. I also recommend that the traffic supervisors monitor even more of her traffic stops with her to ensure that she is complying with the regulations and be given a chance to evaluate her stops.

Gall Aff. Ex. 77. Chief Gall approved those recommendations on August 27, 2009. Id.

On August 27, 2009, Plaintiff submitted to a polygraph examination conducted by an examiner with the State Law Enforcement Division (SLED). The Polygraph Report states the Examination Results of "Deception Indicated," based on the following:

Testing Issue

Examinee is a police officer for the city of Myrtle Beach. A department car that she was operating on her shift received damage to the rear bumper. Dash cam video showed examinee operating the vehicle while responding to a vehicle accident. The

video indicated she drove off the right side of the road and hit two large water filled holes. At the end of her shift, the officer who relieved examinee noticed the damage to the rear bumper. When confronted with the damage, examinee claimed the damage occurred approximately one week earlier. she claimed she noted the damage on the vehicle log. The log disclosed she had noted a tire problem and in a different type of pen, it noted the bumper damage.

Examiner's Results

Responses indicative of attempted deception were noted to the relevant issue.  The following relevant questions were used:

R4) Did you deliberately falsify that vehicle log for car 80?

Examinee Response: No

R6) Did you lie about when you first noticed that damage to car 80?

Examinee Response: No

Gall Aff. Ex. 80.  Plaintiff was informed the polygraph examination "showed some deception,"

Plaintiff did not receive the results of her polygraph exam until after she resigned.  Pl. Dep. pp. 7, 14.

By memo dated August 27, 2009, Capt. Vella reported to Chief Gall:

After reviewing the Polygraph results along with the questions, I feel that the appropriate questions were asked and were in order with the issues at hand and based on the deception noted along with the contributing factors of the case, a Department level hearing should be held to determine the disposition of this Officer's actions.

Attached are the facts of the case from Lt. Dunn and Cpl. Truex.

Bottom line is that this damage was never reported to a supervisor on the 3rd when she says it happened and was noted.

Along with the fact the driver of the car beforehand was Cozene who did not note any damage and when and if Poirier did notice it on the 3rd she never confronted Cozene about it which is very unlikely being that this is PFC Poirier whom we all know would not have driven that vehicle until someone knew about this to cover herself.

Officer Joe West drove the same vehicle on 4 different occasions since the 3rd and never noticed or noted the said damage.

On the 12th PFC Morrel noticed the damage and talked with PFC Poirier about it. Shortly afterwards it was brought to the supervisors attention and at that point, it was shown that it was recorded as happening on the 3rd by PFC Poirier where it was noted that it was written in a different ink color that was used on the 3rd (inspection sheet) but did match that of the 12th (inspection sheet).

I feel that a hearing is in order for PFC Poirier to have the due process available to her.

-10-

If possible I would like to have this hearing on Sept. 2nd at 10:00 am.

Gall Aff. Ex. 81.

With approval from Chief Gall, Lt. Dunn informed Plaintiff that a Department Level Chain of Command Hearing was scheduled for September 2 at 10:00 a.m. Gall Aff. Ex. 82. On instructions from Chief Gall, those in the chain of command conducted additional investigation, Gall Aff. Ex. 81 and 83, which included obtaining a written statement from Officer Morrell about a discussion with Plaintiff on August 12, 2009. Gall Aff. Ex. 84.

On August 31, 2009, Plaintiff received a written reprimand, based on the August 12 traffic stop, for disobeying a directive issued by a supervisor, for giving misinformation about a traffic stop when she radioed it in, and for failure to advise a driver that his traffic stop was being recorded. Gall Aff. Ex. 85. When it was presented to her, she asked about the "other issue" and was told the issue of the vehicle damage would be addressed at the chain of command hearing on September 2. Gall Aff. Ex. 86.

Plaintiff participated in the Department Level Chain of Command Hearing on September 2, 2009, after which Chief Gall reviewed the information presented and sustained the following issues presented to him for action on the unanimous recommendation of her chain of command:

> 1. Poirier failed to notify a supervisor of damage to a vehicle when she observed it, violating procedure 202-A Equipment (sec 6 E-F), and article VI (section 5 Use of City Vehicles) in the Employee Handbook 2. Poirier stated she does not complete daily vehicle inspections and did not follow the protocol of reporting the damage to a supervisor as listed in procedure 901-B Automotive Services (Section 1 A-C) 3. Poirier upon hearing of the call for the accident with injuries at Hwy 501 dispatch that she is responding code as required in procedure 207-A (section 2 C-1) Pursuit Driving Emergency Response.
>
> 4. Both prior to and during her response, Poirier exhibits driving conduct that is not done in a safe manner. Prior to hearing the call of the collision, Poirier passes a vehicle

stopped in the #1 lane by going into the left turn lane and around them. Once responding code, Poirier activates her emergency equipment and goes into a right turn lane to get by traffic. Although Poirier stated that this was the safest route she could take, she exits the roadway/pavement onto the grass at 27 mph in rainy and wet conditions. Additionally, she strikes a large hole filled with water causing a "thud" that can be heard in the video.

. . .

7. Falsifying record/log Sheet and false oral testimony to her supervisor.

Gall Aff. Ex. 87.

On Friday, September 4, 2009, Chief Gall met with Plaintiff, told her that her command staff found her to be unsalvageable as an officer, and asked her to resign. Plaintiff requested time to consider her options. Pl. Dep. p. 12. Chief Gall then informed Plaintiff that she was on leave with pay pending his submission of her termination paperwork to City Manager Tom Leath. Plaintiff Dep. pp. 12-13; Gall Aff. Ex. 90.

On the morning of Tuesday, September 8, 2009 (the day after Labor Day), Chief Gall delivered a written request to City Manager Tom Leath for approval to terminate Plaintiff's employment for violating the City's policies and Department regulations. Chief Gall explained his request as follows:

Pursuant to city policies and procedures, I am hereby requesting approval to terminate the employment of Pfc Kim Poirier, Myrtle Beach Police Department for violating multiple city and department regulations as outlined below:

*City Policy, Article VI, Section 5, Use of City Vehicles, Dept Regulation 901-B, Section 1, A-C Automotive Services*:

Pfc Poirier failed to conduct daily vehicle inspections, and failed to notify a supervisor of vehicle damages to her assigned city vehicle. Pfc Poirier admitted during questioning following discovery of damages to care 1080 (Traffic Unit), that she did not conduct required daily pre and post vehicle inspections, and that she failed to notify her supervisor on 8/3/09 when she discovered damage to the rear bumper of car 1080, her assigned patrol car.

*Dept Regulation 207-A, Section 2, C-1, Pursuit Driving and Emergency Response*:

Pfc Poirier, on 8/12/09 while responding to a vehicle collision report with injuries,

-12-

failed to notify dispatch of her code response, and responded in an unsafe manner by passing vehicles on the right, leaving the paved surface to travel on the grass shoulder during rainy and wet conditions. During her response, she struck a large water-filled pot hole. The response was captured on her in-car video. Prior to this call, and while her video is activated, she is observed passing a stopped vehicle on Hwy 501 eastbound in the turn lane, which is not a legal driving maneuver. Prior to that, she is observed using the left turn lane at Seaboard Street and Hwy 501 Northbound to pass vehicles in the straight-thru lane, and then change two lanes to make an abrupt right turn eastbound on Hwy 501, almost colliding with a vehicle she was running parallel with.

*City Policy Article II-6 Section 9, Falsification of an official record or document....by the preponderance of the evidence*:

Pfc Poirier falsely listed vehicle damages to car 1080 on the vehicle log sheet. Pfc Poirier was assigned to car 1080 on August 3, 2009. She logged the mileage and under comments, she noted the right front tire needed to be replaced. On or about August 12, 2009 when significant bumper damage was discovered, Pfc Poirier told her supervisors that she had previously logged the damage on the inspection sheet, although during subsequent questioning she admitted the damages consisted of 2 small cuts, she described as similar to "knife cuts." The entry in the comments section under August 3, 2009 mentioning the bumper damage was written in a different pen. An officer who was assigned to drive the car August 6-11, 2009 did not see the entry on the log, and did not observe bumper damage. No one else was assigned to drive 1080 between 8/3/09 and 8/12/09 besides Pfc Poirier and this other officer.

On August 12, 2009, following Pfc Poirier's response to a vehicle collision which included her leaving the paved surface and striking a water-filled pot hole, visible bumper damage was reported.

Pfc Poirier failed to let her supervisor know, and upon shift change, she turned over the car to Pfc Rose without a post-shift inspection.

The damage was observed and reported by Pfc Rose and was more substantial than two slits / cuts in the plastic rear bumper. The damages were consistent with the impact her vehicle had when it struck the pot hole on August 12, 2009 (as observed on the in-car video).

Pfc Poirier has an extensive disciplinary history going back to June 2002. Several of these issues demonstrate a continuing pattern of non-compliance with established procedures, i.e., 2 preventable vehicle accidents (01,04), cited for speeding (06), stopped for speeding (09), cited for Open Container (03), and multiple violations involving improper conduct (02,06,07,08,09) with discipline ranging from counseling to at least 4 written reprimands. Pfc Poirier does not normally accept corrective action in a positive manner, and becomes defensive. She has lost the trust of her supervisors who feel that she was dishonest and deceiving in her handling of the situation with the damages to vehicle 1080. She has worked for multiple supervisors who have handled corrective action with her involving non-compliance with expected standards of

-13-

conduct and behavior.

On September 4, 2009, I asked for her resignation in lieu of termination after sharing with her the results of the chain of command review hearing. She refused to resign. I am recommending immediate termination of employment.

Gall Aff. Ex. 88.  The City Manager approved the termination the next day, id., and Chief Gall prepared a termination notice.  Gall Aff. Ex. 92.  On the morning of September 10, 2009, Attorney William Monckton notified Chief Gall on Plaintiff's behalf that Plaintiff had decided to resign.  Gall Aff. Ex. 93.  Plaintiff delivered her signed resignation letter that day to Chief Gall along with her City-issued badge and weapon.  Plaintiff Dep. p. 29.  Chief Gall accepted Plaintiff's resignation.  Gall Aff. Ex. 94.

After resigning her employment, Plaintiff sought employment with Georgetown County Sheriff.  Plaintiff was informed by the Sheriff's Department that Myrtle Beach refused to provide appropriate information for the necessary background check and due to that fact they could not hire her.  Pl. Dep. Ex. 2 p. 532.

### C.     Prior Disciplinary Issues

On May 19, 2002, Plaintiff received oral counseling for a preventable on-duty vehicle accident. Gall Aff. Ex. 2.  On June 7, 2002, Plaintiff received oral counseling for parking her patrol vehicle directly underneath a gate at a detention center, resulting in damage to the gate when it was lowered. Gall Aff. Ex. 3.  On November 5, 2002, Plaintiff received a written reprimand for sending a derogatory message to another officer over police equipment and, on a separate occasion, using vulgar language toward yet another officer.  Gall Aff. Ex. 4.

On May 14, 2003, Plaintiff received oral counseling related to an "open container" citation issued by another law enforcement agency (DNR) on May 11, 2003.  Gall Aff. Ex. 6.  On May 20,

-14-

2003, Plaintiff received a written reprimand and 1-day suspension for her conduct and interaction with the DNR officers who issued her the "open container" citation; in addition, Plaintiff was required to attend anger management counseling and to issue apology letters to the DNR officers. Gall Aff. Ex. 7 and 8.

On February 24, 2004, Plaintiff was reprimanded for excessive force and officer safety issues; during an arrest, Plaintiff did not allow the suspect to comply with her instructions before forcing him to the ground.  Gall Aff. Ex. 10.  On November 17, 2004, Plaintiff received oral counseling for a preventable on-duty vehicle accident.  Gall Aff. Ex. 11.

On June 20, 2006, Plaintiff received oral counseling for receiving a speeding ticket and for not reporting the citation to her supervisors in a timely manner.  Gall Aff. Ex. 15.   On September 26, 2006, Plaintiff received oral counseling for failing to search a prisoner who was later discovered to have a knife.  Gall Aff. Ex. 16.  On October 9, 2006, Plaintiff received oral counseling for using profanity over the police radio. Gall Aff. Ex. 17.

On July 19, 2007, Plaintiff received oral counseling for improper conduct in making a defamatory public comment that the City Planning Commissioner was not supporting a Department cause in the community because the Commissioner "has two nephews who are drug dealers."  Gall Aff. Ex. 22.

On July 16, 2008, Plaintiff received oral counseling for using profanity over the police radio while making an arrest.  Gall Aff. Ex. 29.

 On January 22, 2009, Plaintiff received a written reprimand for poor judgment, speeding, and making inappropriate comments to the Horry County police officer who stopped her for speeding.  Gall Aff. Exs. 33-37.  On February 19, 2009, Plaintiff received oral counseling for using profanity on the

radio. Gall Aff. Ex. 43. On May 15, 2009, Plaintiff received oral counseling for using profanity while arresting a suspect (which was recorded on audio/video equipment). Gall Aff. Ex. 45 and 46.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present

evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

### A.    Scope of Charge

"Before filing suit under Title VII, a plaintiff must exhaust her administrative remedies by bringing a charge with the EEOC." Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir.2000); see also 42 U.S.C. § 2000e–5(f)(1). The allegations contained in the administrative charge of discrimination generally limit the scope of any subsequent judicial complaint. King v. Seaboard Coast Line R.R., 538 F.2d 581, 583 (4th Cir.1976) (stating that a subsequent civil suit "may encompass only the 'discrimination stated in the [EEOC] charge itself or developed in the course of a reasonable investigation of that charge' ") (quoting Equal Employment Opportunity Comm'n v. Gen. Elec., 532 F.2d 359, 365 (4th Cir.1976)); see also Smith, 202 F.3d at 247 ("A plaintiff's EEOC charge defines the scope of her subsequent right to institute a civil suit."). Only those claims stated in the initial administrative charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent lawsuit. Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir.1996) (affirming the district court's dismissal of some of the plaintiff's claims because they were outside the scope of her original EEOC charge and were therefore time barred).

-17-

In her EEOC Charge of Discrimination, Plaintiff checks boxes indicating that she suffered discrimination based upon sex, age, and retaliation.  Pl. Dep. Ex. 2.  There is no box to check for hostile work environment.  In the body of her charge, she asserts that "I was compelled to resign my employment because of the hostile working conditions that were intolerable as any reasonable person would have done."  Id.  Defendant argues that Plaintiff makes no mention that the hostile work environment was based upon a protected trait.  However, a reasonable investigation of complaint would likely have revealed that her hostile work environment claim was based upon her gender and/or age.  Thus, the hostile work environment claim is properly before the court.

**B.     Timeliness of Charge**

Plaintiff filed her EEOC Charge of Discrimination on February 11, 2010, alleging that she suffered a number of adverse employment actions as a result of her gender and age and that she was denied a promotion for retaliatory reasons.  To pursue a Title VII claim, a  plaintiff must "file a complaint with the EEOC within 180 days of the incident, or within 300 days of the incident if state or local proceedings are initiated." Beall v. Abbott Labs., 130 F.3d 614, 620 (4th Cir.1997); 42 U.S.C. § 2000e-5(e)(1); National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).  Here, Plaintiff is required to file her Charge of Discrimination within 300 days following the alleged discriminatory acts.  Thus, Defendant argues that Plaintiff is limited to challenging employment actions that occurred after April 17, 2009.

Plaintiff clarified at her deposition that some of the actions she contests occurred before April 17, 2009. She confirmed her allegation of an involuntarily transfer was based on action taken in July 2008 (not 2009, which she says was a typographical error). Pl. Dep. pp. 18-20. Further, her allegation that she was denied a transfer was based on action taken in February 2009 (not August 2009). Pl.

Dep. pp. 21-23; see also Complaint ¶ 43. Plaintiff also confirmed she was last subjected to urine drug screen testing in late 2008, and was not thereafter asked to submit to such testing. Pl. Dep. pp. 23-26. Thus, Plaintiff's allegations that she was involuntarily transferred, denied a transfer, and subjected to random urine drug screen testing on a discriminatory basis, are all time-barred.

Additionally, Plaintiff asserts a retaliation claim and discrimination claims based upon denials of promotions to Corporal. Pl. Dep. Ex. 2. In her deposition, she asserts that she was denied promotions to Corporal in July 2009, July 2008, July 2007, and July 2006. Pl. Dep. p. 15. When asked to identify the individuals that received the promotions instead of her, she named Brian Truex and Jather Stevens. Pl. Dep. pp. 14-17. She could not specifically recall the dates on which Truex and Stevens were promoted. When asked if Truex was promoted in July of 2009, Plaintiff responded, "Thereabouts." Pl. Dep. p. 17. She testified that other males, including Stevens, were promoted to Corporal "over the course of 2008 and 2009." Id. However, as set forth above, Truex and Stevens were both promoted to Corporal prior to April 17, 2009, and there was not thereafter any Corporal promotion during Plaintiff's employment. Gall Affidavit ¶ 6. Thus, Plaintiff's claims based upon denials of promotions are time-barred as well.

In sum, the only claims properly before the court are Plaintiff's claims of age and gender discrimination and retaliation based upon her involuntary resignation[5] and her hostile work

---

[5]As discussed above, Plaintiff received a written reprimand on August 31, 2009, as a result of the August 12, 2009, traffic stop and use of radio communications. Plaintiff does not appear to allege that this action was discriminatory. However, to the extent she does, such a claim fails because written reprimands do not generally rise to the level of an adverse employment action. See Lewis v. Forest Pharmaceuticals, Inc., 217 F.Supp.2d 638, 648 (D.Md.2002) ("Reprimands, whether oral or written, do not per se significantly affect the terms or conditions of employment.") (citing Nye v. Roberts, 159 F.Supp.2d 207, 213 (D.Md.2001), vacated and remanded on other grounds, 2002 WL 31163732 (4th Cir.2002)); Oest v. Illinois Dep't of Corrections, 240 F.3d 605,

environment claim.

## C.    Gender and Age Discrimination

Plaintiff argues that Defendant discriminated against her based upon her gender and age. Her gender claim arises under Title VII and her age claim arises under the ADEA. Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). The ADEA makes it unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. 29 U.S.C. § 623(a)(1).

At the outset, the parties disagree as to the applicable law. Defendant argues that, because Plaintiff's employment was not terminated, the law of constructive discharge[6] applies. Plaintiff argues that she has not alleged constructive discharge, her resignation was forced and, thus, it should be treated as an adverse employment action. Assuming Plaintiff is correct and her forced involuntary

---

612–613 (7th Cir.2001) (job related criticism, including negative performance reviews and oral or written reprimands, does not constitute an adverse employment action absent some tangible job consequence); <u>Naughton v. Sears, Roebuck & Co.</u>, No. 02–4761, 2003 WL 360085 at *5 n. 1 (N.D.Ill.2003) (criticism, including a negative performance review or development plan, does not constitute an adverse employment action).

[6]An employee alleging constructive discharge must "allege and prove two elements: (1) the deliberateness of [the employer's] actions, motivated by [gender or age] bias, and (2) the objective intolerability of the working conditions." <u>Honor v. Booz-Allen & Hamilton, Inc.</u>, 383 F.3d 180, 187 (4th Cir. 2004). Proving deliberateness requires "that the actions complained of were intended by the employer as an effort to force the employee to quit." <u>Martin v. Cavalier Hotel Corp.</u>, 48 F.3d 1343, 1354 (4th Cir. 1995).

resignation was an adverse employment action, her claim of discrimination fails.

The familiar proof scheme developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) applies to claims under both Title VII and the ADEA[7] and the prima facie requirements are similar as well.  To establish a prima facie case of discrimination under either Title VII or the ADEA, a plaintiff must show (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that similarly-situated employees outside the protected class received more favorable treatment.  White v. BFI Waste Services, LLC, 375 F.3d 288, 295 (4th Cir. 2004) (Title VII); Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir.2004) (ADEA).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the adverse action.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  This is merely a burden of production, not of persuasion.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)).  In other words, the burden shifts back to Plaintiff to demonstrate by a

---

[7]The Supreme Court recently noted that it "has not definitively decided" whether the McDonnell Douglas framework, first developed in the context of Title VII cases, "is appropriate in the ADEA context." Gross v. FBL Financial Services, Inc., --- U.S. ----, 129 S.Ct. 2343, 2349 n.2, 174 L.Ed.2d 119 (2009). In the absence of further direction from the Supreme Court, the undersigned must follow Fourth Circuit precedent, which applies the McDonnell Douglas framework to ADEA claims. See Hill, 354 F.3d at 285; see also Bodkin v. Town of Strasburg, 2010 WL 2640461 at *4-5 (4th Cir. June 29, 2010) (continuing to apply the McDonnell Douglas framework following the Gross opinion).

preponderance of the evidence that the legitimate reason produced by Defendant is not its true reasons, but was pretext for discrimination. Reeves, 530 U.S. at 143. Throughout the burden shifting scheme set forth in McDonnell Douglas, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against him.

Defendant argues that even if Plaintiff can establish a prima facie case of age and/or gender discrimination, it has produced a legitimate, non-discriminatory reason for the adverse action and Plaintiff fails to show that the reason was pretext for a discriminatory reason. As set forth in detail above, a thorough investigation was conducted regarding the damage to Plaintiff's vehicle and, based upon the investigation, including a polygraph test of Plaintiff that indicated Plaintiff was deceptive, Plaintiff's supervisors concluded that termination was appropriate for several violations of policy, including failing to notify supervisors of damage to her vehicle, responding to an emergency in an unsafe manner, and falsifying documents regarding the damage to her vehicle, in addition to her history of disciplinary actions.

Therefore, the burden of proof returns to Plaintiff to show that Defendant's legitimate, non-discriminatory reason for her termination was actually pretext for a discriminatory reason. Plaintiff argues that a genuine dispute of material fact exists with respect to pretext because other male officers were treated differently. However, to be similarly situated, a "plaintiff must establish that 'other employees' were similarly situated in all relevant respects; that they 'dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them

-22-

for it.' " <u>See</u> <u>Ward v. City of North Myrtle Beach</u>, 457 F.Supp.2d 625, 643 (D.S.C.2006).

In her Response, Plaintiff points to two other officers whom she felt were treated more favorably. Brian Truex drove a motorcycle into Costco to assist an officer with a shoplifter and received an oral reprimand. Pl. Dep. pp. 26-27. Another officer, James Kerns, used a city computer for inappropriate personal reasons and was not disciplined as Plaintiff. Pl. Dep. pp. 27-28. Officer Kearns was transferred and received a written reprimand. However, Plaintiff fails to show that these two officers engaged in conduct that is sufficiently comparable to the conduct for which Plaintiff was asked to resign.

Plaintiff also argues that non-actionable, i.e. time-barred, conduct provides evidence of pretext. Specifically, Plaintiff asserts that "Chief Gall used several opportunities to discriminate against [her] when he failed discipline here as he disciplined other similarly, situated younger male employees, failed to promote her, failed to allow her on the specialized traffic unit, and failed to transfer her." Pl. Response pp. 18-19. However, other than her own, generalized, self-serving statements, Plaintiff fails to present evidence that these decisions made by Chief Gall were motivated by any discriminatory animus. For instance, Plaintiff generally asserts that the officers who received promotions over her and those that were transferred to the specialized traffic unit over her were less qualified and less experienced than she was, but she presents no evidence regarding the qualifications or experience of these other officers. She also states that she witnessed two male officers being transferred to the day shift after she was told that it would be a while before she would be transferred. Again, she provides no context or additional information regarding this occurrence. Thus, Plaintiff fails to present sufficient evidence to support her claim of pretext based upon Gall's prior decisions. <u>See</u> <u>White v. Boyle</u>, 538 F.2d 1077, 1079 (4th Cir.1976) (conclusory allegations

are insufficient to avoid summary judgment); National Enterprises, Inc. v. Barnes, 201 F.3d 331, 335 (4th Cir.2000) ("Marvin J. Barnes' self-serving affidavit describing the content of the repurchase agreements is not enough to defeat National's motion for summary judgment."); Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985) (holding that unsupported allegations "do not confer talismanic immunity from Rule 56"); Fuller v. Cnty. of Charleston, 444 F.Supp.2d 494, 499 (D.S.C.2006) ("It is well established that a court does not abuse its discretion by striking portions of a party's affidavit consisting of conclusory statements or self-serving opinions without objective corroboration.").

Additionally, the Fourth Circuit has held that "where the hirer and the firer are the same individual . . . a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991); Evans, 80 F.3d at 959 (In rejecting Title VII gender discrimination claim, the Fourth Circuit declared that "because [the supervisor] is the same person who hired [the plaintiff], there is a 'powerful inference' that the failure to promote her was not motivated by discriminatory animus."); Tyndall v. National Educ. Centers, Inc. of California, 31 F.3d 209, 214-15 (4th Cir. 1994) ("[T]his court [has] noted that '[w]hen the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer'"). Chief Gall, a male who is older than Plaintiff, hired Plaintiff in 2001 and promoted her in 2003. Plaintiff's pretext argument is undercut for this reason as well.

In sum, it is Plaintiff's burden ultimately to show that illegal discrimination was the motivating factor in his termination. It is not necessary for this court to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for Defendant's decision.

-24-

Hawkins v. Pepsico, 203 F.3d 274, 279 (4th Cir.2000). Plaintiff must show that a reasonable jury could believe her explanation of intentional discrimination. Love–Lane v. Martin, 355 F.3d 766, 788 (4th Cir.2004). Plaintiff has failed to meet her burden of creating a genuine dispute of material fact as to whether her involuntary resignation was based upon her age or gender. Therefore, summary judgment is appropriate on Plaintiff's claims of age and gender discrimination.

### D.    Retaliation

Plaintiff alleges that Defendant retaliated against her in violation of Title VII.  Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) he engaged in protected activity, (2) the employer took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse action. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985); Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 258 (4th Cir.1998); Causey v. Balog, 162 F.3d 795, 803 (4th Cir.1998). If Plaintiff establishes a prima facie case, Defendant can rebut the presumption of retaliation by articulating a non-retaliatory reason for its actions. At that point, Plaintiff has the opportunity to prove that Defendant's legitimate, non-retaliatory reason is pretextual. See Matvia v. Bald Head Island Management, 259 F.3d 261, 271 (4th Cir.2001).

Assuming, arguendo, Plaintiff has established a prima facie case of retaliation, for the reasons discussed above, Defendant has presented a legitimate, non-retaliatory reason for the action taken

-25-

against Plaintiff and Plaintiff fails to show that its reason is pretext for a retaliatory reason. Therefore, summary judgment is appropriate on Plaintiff's retaliation claim.

### E.  Hostile Work Environment

Plaintiff alleges a cause of action for hostile work environment.  Title VII prohibits an employer from subjecting an employee to a hostile work environment because of the employee's protected class. 42 U.S.C. § 2000e–2(a) (1).  To state a prima facie case of a hostile work environment, a plaintiff must demonstrate that: (1) she experienced unwelcome harassment; (2) the harassment was based on her protected class; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." Chao v. Rivendell Woods, Inc., 415 F.3d 342, 347 (4th Cir.2005); White v. BFI Waste Servs., LLC, 375 F.3d 288, 297 (4th Cir.2004); Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003).

At the outset, it is noted that both parties devote limited discussion to this issue.  As a result, it is not entirely clear what harassment Plaintiff claims she suffered that created a hostile work environment.  However, based upon the facts presented in Plaintiff's response, she presumably is arguing that the discipline she received, her promotion denials, the denial of her request to be transferred to the day shift, and the denial of her request to be on the specialized traffic unit created a hostile working environment.  However, as discussed above, other than her own, generalized self-serving statements, Plaintiff fails to present evidence that these decisions were based on her age or gender.  Likewise, although Plaintiff asserts that she was subjected to numerous drug tests, she fails to present sufficient evidence to show that the drug tests were based upon her age or gender.

A plaintiff must show that "but for" one of her protected traits, she would not have been a victim of harassment. See Causey v. Balog, 162 F.3d 795, 801 (4th Cir.1998) (Title VII & ADEA). The federal anti-discrimination statutes do not protect employees from hostility and abuse from their supervisors unless the objectionable conditions occur because of a protected characteristic. See Graham v. Prince George's Cnty., 191 Fed. Appx. 202, 204 (4th Cir.2006) (unpublished) (finding the district court did not err in determining that "although [the] facts reflected an unpleasant working environment, they did not support a hostile one based on an unlawful characteristic"); see also Oncale v. Sundower Offshore Servs., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (Title VII); Shirer v. Tri–County Elec. Coop., Inc., C/A No. 5:07–1156–MBS, 2009 WL 2900767, *8 (D.S.C. Sept.9, 2009) (unpublished) (Title VII & ADEA).

Furthermore, Plaintiff must show that the harassment was sufficiently severe and pervasive to alter the conditions of her employment and create an abusive environment.  Plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Actionable harassment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21. Title VII is not a "general civility code." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe and pervasive standard." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir.2008).  Plaintiff also fails to make this

showing.

Because Plaintiff fails to present sufficient evidence to create an issue of fact as to whether the alleged harassment was based upon her sex or age or whether it was sufficiently severe and pervasive to alter the conditions of her employment, her hostile work environment claim fails and summary judgment is appropriate.

## V.    CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary Judgment (Document # 25) be granted and this case be dismissed.

 s/Thomas E. Rogers, III

Thomas E. Rogers, III

United States Magistrate Judge

January 16, 2013

Florence, South Carolina